UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD DEAN DUVALL, #476526,

        Petitioner,

                                      CASE NO. 2:09-CV-11663

v.                                    HONORABLE DENISE PAGE HOOD

THOMAS K. BELL,

        Respondent.

_____/

### OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

**I.**    **Introduction**

      This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Donald Dean Duvall ("Petitioner") and his co-defendant brother, Raymond Wilbur Duvall Jr., were convicted of two counts of first-degree murder, MICH. COMP. LAWS § 750.316, following a jury trial in the Oscoda County Circuit Court and were sentenced to concurrent terms of life imprisonment without the possibility of parole in 2003. In his pleadings, Petitioner raises claims concerning the admission of hearsay, the jury instructions, prosecutorial misconduct, the non-disclosure of evidence, the failure to produce *res gestae* witnesses, an amendment to the information, the coercion of witnesses, the effectiveness of trial and appellate counsel, and cumulative error. For the reasons set forth below, the Court denies the petition for a writ of habeas corpus. The Court also denies a certificate of appealability and denies leave to proceed *in forma pauperis* on appeal.

II.    **Facts and Procedural History**

Petitioner's convictions arise from the deaths of two hunters near Mio, Michigan in 1985.

The Michigan Court of Appeals summarized the case as follows:

> Defendants' convictions arise from the disappearance and suspected killing of two
> hunters who never returned from a weekend hunting trip in November 1985, in the
> Mio area of northern Michigan. The two men, David Tyll and Brian Ognjan, had
> planned to travel to Tyll's family cabin in White Cloud and visit a friend, Dennis
> Gallop, in Mio, but they never arrived at either location. According to the
> prosecutor's theory of the case, defendants, along with other unidentified individuals,
> beat the victims to death after they became involved in an argument. The victims'
> bodies were never found, nor were their car or other personal effects ever located.
> The prosecutor's case principally relied on the testimony of a local resident, Barbara
> Boudro, who claimed to have witnessed the killings, and on various statements
> allegedly made by defendants admitting to their participation in the killings.

*People v. Duvall*, No. 252720, 2005 WL 1249238, *1 (Mich. App. May 26, 2005) (unpublished).

At trial, the victims' family members and friends testified about the victims' hunting plans

for the weekend of November 22, 1985.  They confirmed that the men left in Tyll's 1981 black Ford

Bronco that Friday afternoon, likely for the Mio area where another friend lived, and planned to

come back on Sunday evening.  They never returned home.  The victims' families reported them

missing to the authorities, newspaper articles were written about them, and searches were conducted,

but the men and their vehicle were never found.  Eventually the men were declared dead.

Several witnesses reported seeing the victims in the Mio area that weekend.  Mio resident

Larry Barker testified that two men in a dark Ford Bronco pulled into his driveway for directions

on at 7:00 or 8:00 p.m. on Friday or Saturday night.  They appeared to have been drinking, were

looking for M-55, and were going hunting.  Barker saw a television report about the missing hunters

a month later, recognized them as the men he met, and contacted the police.

David Welch testified that he talked to the victims at Walker's Bar in Mio around 9:30 or

2

10:00 p.m. that Saturday. They told him that they were staying at Ma Deeter's in Luzerne and were deer hunting. They also said that they were looking for women, planned to see some school friends in Luzerne and South Branch, and did not want to meet Tyll's family in White Cloud. David suggested places where they could meet women such as Northwoods and the Ski Ranch, also known as Linker's. Ognjan went to Northwoods while Tyll stayed at Walker's Bar. By the time Ognjan returned, Tyll had been cut off from drinking. The men left the bar. When Welch went outside, he saw a 1981 black Ford Bronco in the parking lot, but no one was in it. Welch admitted that he used to drink every day, but said that he had stopped doing so.

Beverly Pasternak, the owner of Walker's Bar, confirmed that Welch and the two victims were at the bar on Saturday night. She recalled telling the barmaid to stop serving Tyll and allowing him to wait for Ognjan. The men left the bar between 10:00 and 11:00 p.m. They returned to the bar at noon the next day and had a soft drink and a beer. Two weeks later, the sheriff came in and asked about the two hunters. Pasternak identified the men and gave the sheriff a flannel jacket that she thought Tyll had left at the bar.

Cindy Steinhurst, an employee at Linker's Bar, testified that the victims came into the bar and ordered drinks on a weekend night during deer hunting season. She told police that she thought it was around 9:00 p.m. on Sunday night. Ognjan went to the bathroom and when he returned, Tyll was paying for the drinks. Ognjan was upset with Tyll because he wanted to pay for the drinks and told Steinhurst that he would kick her ass if she took Tyll's money. Steinhurst told Steve Linker, the bar owner, that she did not want to wait on the men. Linker talked to the men. Steinhurst did not see an argument in the bar that night. She did not know Petitioner or his co-defendant and did not recall seeing them or Barbara Boudro at the bar that evening. She admitted that if the bar was

3

busy she would not know who was there that night.

The prosecution's main witness, Barbara Boudro, was the only person who testified that she witnessed the crime. Boudro lived in a house on Mapes Road about one and a half miles from Linker's Bar in 1985. Boudro testified that she and a friend named Ronald Emery went to Linker's Bar on Saturday night to celebrate his first buck. While she and Emery were playing pool, the two hunters came into the bar. One of them rubbed against her and she told them to keep their hands to themselves. They wanted to play pool for money, but she declined. Petitioner, who was known as Co-Co, the co-defendant, who was known as JR, and a third brother named Rex Duvall entered the bar. The two hunters were acting "nasty" and creating a disturbance with other people in the bar. Boudro was going to call the police, but someone told her they had already been called. Boudro overheard Petitioner on the telephone saying that he could use help. Sherman Heiling and another man arrived and went to Petitioner's table. The man she did not know asked where he could get marijuana. She told him, and he and Rex Duvall left the bar, returning later. Boudro was subsequently given beer, left the bar with Emery and a man named Dick Baker, and went home. Boudro admitted that she had seven or more drinks that evening.

While at home with Emery, she heard noises and went into the kitchen. She heard men arguing and cursing. One man said, "you are dead, you rotten mother fucker." Boudro also heard a sound like metal hitting something. Boudro and Emery went outside and followed a path through the snow to a clearing. They stayed behind some bushes and saw a Bronco and a pickup truck with their lights on. Ognjan was trying to run away, but the men restrained him. Petitioner and the co-defendant were beating Tyll, who was crying for help. Petitioner hit Tyll with something that sounded metallic while the co-defendant kicked and punched him. Petitioner struck Tyll's head and

4

it exploded.  Ognjan collapsed and the men laughed because he had urinated on himself.  Petitioner and the co-defendant then beat Ognjan.  Boudro went home and Emery followed her a few minutes later.  Within five minutes, Petitioner and the co-defendant knocked on her door.  Petitioner told her that they knew her and her family and said, "You saw nothing, You heard nothing.  Pigs have to eat too."  The two men left.  Boudro and Emery followed them in their car until the men stopped.  Boudro and Emery drove past and got lost before returning home.  The next morning, she and Emery went to the clearing and saw what looked like blood on the ground.  Boudro testified that Ronald Emery and Sherm Heilig had since died.

Boudro testified she once told a county sheriff, with whom she had been having an affair, about the incident.  She was scared to come forward.  She had received warnings every time the police came by to investigate the missing hunters.  She had been threatened and told that she had pretty granddaughters.  One of her dogs was shot in the head and another dog was run over in her yard.  Boudro recalled Michigan State Police Detective Lesneski coming to her house in 1998 and speaking with him in 1999.  She was upset and nervous and told him that he was going to get her killed.  Boudro said she would talk if a woman named Kim talked.  She told him that the two hunters were killed near her home and that their car was taken apart in a gray building on the corner.  She initially told Lesneski that Ronald Emery was the one who witnessed the murders because she was afraid of Petitioner and his brothers.  After speaking with Lesneski, she said that she also witnessed the murders.  Boudro recalled saying that she would never tell the truth while being questioned under an investigative subpoena.

Boudro admitted that she had a drinking problem, but said she stopped drinking in 1994.  She also admitted using drugs.  She had been taking medication for depression for several years, but

5

denied being delusional.  Boudro was aware that there was a reward in the case which had reached $100,000, but she did not claim it.  She acknowledged various discrepancies in between her police statements, preliminary examination testimony, and trial testimony.

Several witnesses testified about statements that Petitioner and the co-defendant made regarding the two hunters.  Edward Lavere testified that he had known the defendants for 20 years and they were in the junk car business.  He had lived with them for a time and Petitioner later rented from him.  During an eviction, Petitioner threatened to do the same thing to him that he had done to the hunters.  The co-defendant warned him that "the family sticks together."

Tammy Morris, cousin of the Duvalls and Lloyd Harmon's ex-wife, testified that she heard parts of a conversation about the two hunters while at a bar in Wixom for her sister's birthday party in 1987.  She heard that Petitioner was beaten up by some men and they threw him from a truck. Petitioner and his brothers found the men who did it, fought with them, put them through a shredder, and fed them to pigs.  Morris admitted that she denied hearing such conversation when she first spoke to the police because she was scared.  She also acknowledged variations from her prior statements.  Morris denied being threatened by the police, although there was a rumor that she could lose custody of her children if she did not testify.

Lloyd Harmon testified that he had been married to Tammy Morris.  He recalled sitting at a table with Petitioner, the co-defendant, Charles McMullen, Sr., and David Younkin during a birthday party at a bar in 1986 or 1987.  Petitioner and the co-defendant talked about getting into a fight with the two hunters, beating them, killing them one at a time in the woods, and then feeding them to pigs.  Harmon acknowledged that he testified differently before a grand jury in 1989 or 1990, and that he was interviewed by Detective Lesneski in 2002 and gave a statement under

6

investigative subpoena in 2003. Harmon said that he moved to Kentucky after receiving threats, and that Petitioner's cousin, Susan Younkin, threatened him three days before he testified. He admitted that neither Petitioner nor the co-defendant threatened him.

Connie Sundberg testified that she lived with Petitioner from 1980 to 1989. In 1985, they lived near South Branch and the co-defendant lived across the street and kept pigs. Sundberg recalled being at the co-defendant's house making dinner with his girlfriend and believed it was Thanksgiving, 1985. A nice black Ford Bronco pulled into the driveway. The co-defendant told the driver, who she thought was Rex Duvall, to "get the fucking thing out of here before we all get in trouble." The co-defendant, Randy Duvall, and Kenny Duvall all scrapped cars. Sundberg also recalled a night when Petitioner was brought home by the co-defendant, Rex Duvall, and Sherm Heilig. Petitioner was drunk and crying and said that they killed someone. Petitioner then called her a "fucking bitch," hit her, and warned her not to say anything. When she asked him about it the next day, Petitioner said, "shut the fuck up or I will kill you." Sundberg was interviewed by the police in 1989 and she testified under investigative subpoena in 2003.

The grand jury testimony of deceased witness Eileen Seitz was read into the record. Seitz lived with the co-defendant for several years until 1984. She recalled walking in on a conversation between Petitioner, the co-defendant, Rex Duvall and Sherm Heilig while they were drinking at Randy Duvall's house in November, 1985. Heilig said, "we'll never bring this subject up again." and Petitioner said, "I know we're just going to get caught." They shook on it, but Seitz did not know what they were talking about. Around the same time, Seitz saw Randy Duvall in a nice black Bronco. Randy told her that it belonged to his boss. Seitz also said that the Duvalls chopped up cars and buried stolen car parts.

7

Patsy Evans, Petitioner's former sister-in-law, testified that she was in a bar when fliers about the missing hunters were hung. The co-defendant came in and said that he had cut them up and ate what was left. She was interviewed by police.

Donna Sholl, Connie Sundberg's sister, testified that she lived with the co-defendant from 1988 to 1989. During that time, the police had re-opened the investigation into the missing hunters. She overheard the co-defendant and Heilig discussing who might have spoken to the police. The co-defendant said that there was a snake in the woodpile and they had to find it. Sholl subsequently asked what they did with the skulls because the pigs would not eat them, and the co-defendant threatened to cut her up and feed her to the pigs. Sholl admitted that she was angry with the co-defendant for beating her and that she hated him.

Anne Payne testified that she used to own a bar in Monroe, Michigan. She recalled Petitioner being in the bar and talking about the missing hunters sometime in the early 1990s.

Donna Holbrook testified that she had an affair with the co-defendant. When police came to her home in 1989, he was hiding in her bedroom. When they left, the co-defendant was nervous and called his brother Kenny Duvall. The co-defendant also told Holbrook that people who talked too much did not stick around long and that the police would never find anything because they covered their tracks. Holbrook knew that the co-defendant dealt in scrapped cars and car parts.

Patricia Abbott testified that she was Rex Duvall's neighbor in 1985. She recalled seeing a dark Ford Bronco at his house around the time the hunters went missing. She also said that Rex Duvall got rid of his pigs at that time, though it would not be unusual to butcher them.

Frank Duvall, one of the defendants' brothers, testified that he had appeared before a grand jury in 1990, but could not recall appearing twice. He could not recall the substance of his

testimony, but he did remember hearing Petitioner say that the police were dumb and that if they found one body, they would find the other body underneath it.  His grand jury testimony was admitted into evidence.

Kenneth Duvall, another brother of the defendants, appeared before a grand jury in 1990 and said he knew nothing about the missing hunters.  After he was arrested on an unrelated charge in 1993, he told the police he had lied to the grand jury because he was scared.  At trial, Kenneth Duvall claimed that he could not remember what he told police because he had a crack problem then and had a stroke and Alzheimer's.  He could not recall telling the police about the dismantling of a 1980 black Ford Bronco.  He also could not recall telling the police that Petitioner spit on a missing person poster and said that the hunters deserved it.

Charles McMullen Jr., a cousin of the defendants, testified that he saw a black Ford Bronco at Susan Younkin's house in 1985 or 1986.  On another day in 1987, Petitioner was drunk and made a comment about someone's head splitting like a melon.  Petitioner also told him that the co-defendant shot someone over a deer, that they cut another man up and fed him to the pigs, and that they fed their car through a shredder.  McMullen reported the remarks to the police and said that the defendants would kill him if they found out he was talking.  McMullen said that he lived in Florida and admitted that he was awaiting trial on an unrelated matter.

Catherine Sliwinski testified that she lived with the co-defendant's son, Tom Duvall, for almost three years.  During an argument, Tom asked the co-defendant to tell her about the two hunters.  The co-defendant then told her that he and Petitioner had an argument with the two hunters over a deer, later ran into them at a bar, beat them up smashing their heads like a melon, chopped up their bodies, and fed them to the pigs.  The co-defendant threatened to do the same to her if she

left or turned against them.  Sliwinski came forward after Petitioner and the co-defendant had been arrested.  She learned about the reward just before she testified.

Police officers also testified at trial.  Michigan State Police Detective Curtis Schram testified about his investigation of the case, including his taped interview with Kenneth Duvall, and police searches for the missing vehicle.  Michigan State Police Detective Sergeant Robert "Bronco" Lesneski testified that he took over the investigation in 1998 and discussed the numerous tips, searches, and actions undertaken to find the two hunters and their vehicle.  He confirmed that neither the hunters nor the vehicle had ever been found and that the police had no physical evidence linking the defendants to their disappearance.  He stated that Richard Baker had a stroke and could not appear for trial.  Detective Lesneski also testified about his meetings with Barbara Boudro and related the substance of their conversations, including her description of the crime.  She initially explained what occurred as coming from Ronald Emery, but eventually admitted that she had witnessed the incident.  Lesneski also testified that she identified the two hunters, Petitioner, the co-defendant, and other Duvall brothers from photographs.

Petitioner and the co-defendant presented several defense witnesses.  Genevieve Yaklin testified that she saw a black Bronco near the freeway in Roscommon County at 9:30 a.m. on November 23, 1985 while she was hunting with her husband.  When they were leaving at 5:00 p.m., the Bronco was still there with three people inside of it.  She contacted the police after hearing about the two missing hunters.  She later identified one of the men, who was wearing a distinctive hat, after seeing a story about a deputy who was shot in Gaylord.  She learned that he was named Hannah and was subsequently killed in Georgia.  Yaklin admitted that when she first spoke to police in 1988, she could not positively identify the two hunters as the men she had seen in the Bronco.

10

Warren Steven Linker testified that he owned Linker's Bar in the fall of 1985. He remembered the two hunters coming into the bar on November 23, 1985 because they caused a problem with an employee. He did not recall Petitioner, the co-defendant, Barbara Boudro, Ronald Emery, or Dick Baker being there that night, but admitted that he did not know everything that may have happened that night.

Alphonse Puzniak testified that he spoke to the police in 1986 about seeing the two hunters near his property in Ogemaw County. He also spoke to Detective Lesneski in 1999. Puzniak explained that he saw a Bronco and four individuals who had scared off a deer. He told them to leave the area. When shown a photograph of David Tyll's Bronco, Puzniak said that the one he saw looked different.

Daniel Dutton testified that he called Crime Busters after seeking a request for information in 2000. He claimed that brothers named Dennis and Artie Mehay told him that they killed the two hunters with a hatchet in front of a bar in Grayling because they were mouthy and that they put the hunters' bodies in a river. Dutton also claimed to have seen the missing Bronco on three occasions. Dutton indicated that he had information about numerous other murders.

Randy Duvall, one of the defendants' brothers, testified that he owned a black 1982 Chevy Blazer. He had not seen Charles McCullen since 1992. He said that neither of the defendants had talked about the alleged murders of the two hunters. He acknowledged that he scrapped cars.

Tom Duvall, the co-defendant's son, denied having any conversation about the murders with Catherine Sliwinski and claimed that her testimony was motivated by a custody battle. He knew that the defendants had been questioned about the murders and released.

David Younkin testified that he was at his wife Susan's birthday party at the bar in 1987, but

did not recall a conversation about the two hunters. He acknowledged that there had been talk about the hunters getting cut up and fed to pigs over the years. He did not see the defendants driving a black Bronco. Susan Younkin similarly testified that she did not hear Petitioner talking about the missing hunters at the party. She could not recall talking to her sister about it. She had been interviewed by police and had moved to Florida with her husband. She denied threatening Lloyd Harmon.

Petitioner testified in his own defense at trial. He denied knowing or killing the two hunters and denied threatening anyone. He testified that nothing unusual happened around Thanksgiving in 1985 and contradicted much of the testimony given by prosecution witnesses. He admitted that there were rumors about his involvement in the murders and that he had been questioned by police. He also admitted that he scrapped cars, drank heavily, and used marijuana during the time in question. The co-defendant also testified at trial and denied committing the crime.

At the close of trial, the jury convicted Petitioner of two counts of first-degree murder. The trial court subsequently sentenced him to life imprisonment without the possibility of parole on those convictions. The co-defendant was similarly convicted and sentenced.

Following sentencing, Petitioner filed an appeal as of right with the Michigan Court of Appeals, raising claims concerning the admission of hearsay testimony, the jury instructions on other acts evidence, and the effectiveness of trial counsel. The court affirmed his convictions and sentence. *People v. Duvall*, No. 252720, 2005 WL 1249238 (Mich. App. May 26, 2005) (unpublished). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v. Duvall*, 474 Mich. 937, 706 N.W.2d 18 (2005).

In 2006, Petitioner filed an initial habeas petition with this Court raising the same three

12

claims presented to the state courts on direct appeal of his convictions, which he ultimately withdrew in order to exhaust additional issues in the state courts. *Duvall v. Berghuis*, No. 06-CV-15092 (E.D. Mich. Oct. 31, 2007).

While his initial habeas petition was pending, Petitioner filed a motion for relief from judgment with the state trial court raising claims concerning prosecutorial misconduct, the admission of hearsay, the non-disclosure of evidence, the failure to produce *res gestae* witnesses, the amendment of the information, coercion of witnesses, the effectiveness of trial and appellate counsel, and cumulative error.   The trial court denied the motion, finding that it lacked "any arguable merit."   *People v. Duvall*, No. 03-772-FC (Oscoda Co. Cir. Ct. April 4, 2008) (unpublished).  Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied for failure "to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)."   *People v. Duvall*, No. 285013 (Mich. Ct. App. Oct. 1, 2008) (unpublished).  Petitioner also filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Duvall*, 483 Mich. 913, 762 N.W.2d 516 (2009).

Petitioner thereafter instituted this habeas action, raising the claims presented to the state courts on direct appeal and collateral review of his convictions.  Respondent has filed an answer to the petition contending that it should be denied because the claims lack merit, are untimely, and/or are barred by procedural default.

## III.   <u>Standard of Review</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA provides

13

in relevant part:

>An application for a writ of habeas corpus on behalf of a person in custody
>pursuant to the judgment of a State court shall not be granted with respect to any
>claim that was adjudicated on the merits in State court proceedings unless the
>adjudication of the claim--
>
>(1)     resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the
>        Supreme Court of the United States; or
>
>(2)     resulted in a decision that was based on an unreasonable determination of
>        the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court

14

decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* ( citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, _ U.S. _, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give

15

reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

**IV.   Analysis**

    **A.   Evidentiary Claim**

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting Detective Lesneski's testimony concerning Barbara Boudro's behavior, demeanor, and prior statements. The Michigan Court of Appeals denied relief on this claim finding that the testimony was properly admitted under the Michigan Rules of Evidence – albeit for reasons other than stated by the trial court. Specifically, the Michigan Court of Appeals ruled that Lesneski's testimony regarding Boudro's behavior and demeanor was properly admitted because it was based

16

upon Lesneski's own observations and Boudro's demeanor was non-assertive conduct and not a statement under the hearsay rules. *Duvall*, 2005 WL 1249238 at *2. The court further determined that Lesneske's testimony regarding Boudro's statements of her fear were admissible because they were offered for a nonhearsay purpose to explain why Boudro changed her testimony and/or that the statements of fear fell within the state of mind exception to the hearsay rule. *Id.* Lastly, the court ruled that Lesneske's testimony regarding Boudro's statements about the murders was admissible as evidence of prior consistent statements. *Id.*

The Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Alleged trial court errors in the application of state law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). In other words, "[t]rial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action, unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *McGuire*, 502 U.S. at 69-70); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). To the extent that Petitioner asserts that the state courts erred in ruling on the disputed testimony under the Michigan Rules of Evidence, he merely alleges a violation of state law which does not entitle him to federal habeas relief. *See Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003). State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*,

17

546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

Petitioner has not shown that the admission of the disputed testimony rendered his trial fundamentally unfair. The evidence was relevant to issues in the case and was admissible under state evidentiary rules. Defense counsel had ample opportunity to challenge Detective Lesneski's testimony and to question Barbara Boudro and contest her credibility at trial. The admission of the evidence did not violate Petitioner's confrontation rights given that Boudro testified at trial and was subject to cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 54 (2004). Petitioner has failed to establish that the admission of the disputed testimony rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### B.    Jury Instruction Claim

Petitioner next asserts that he is entitled to habeas relief because the trial court failed to instruct the jury on the proper consideration of the other acts evidence. The Michigan Court of Appeals did not address this issue as a distinct claim, but denied relief on related claims concerning the admission of the other acts evidence itself and the effectiveness of trial counsel. The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof.[1]

As noted, alleged trial court errors in the application of state law are generally not cognizable as grounds for federal habeas relief. *See Estelle*, 502 U.S. at 67-68; *Serra*, 4 F.3d at 1354; *see also McAdoo*, 365 F.3d at 494; *Bugh*, 329 F.3d at 512. Similarly, in order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than the instructions are undesirable, erroneous or universally condemned. Rather, taken as a whole,

---

[1]The Court notes that it would reach the same result under a *de novo* standard of review.

they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle*, 502 U.S. at 72; *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

The failure to give an instruction supported by the evidence does not automatically warrant habeas relief – the failure to instruct must have rendered the trial fundamentally unfair. *See Maes v. Thomas*, 46 F.3d 979, 984-85 (10th Cir. 1995); *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1995). The failure to instruct is not unfair when the instructions as a whole adequately present the defense theory to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. State law instructional errors rarely form the basis for federal habeas corpus relief. *Estelle*, 502 U.S. at 71-72.

The jury instructions in this case were adequate to protect Petitioner's rights. As discussed by the Michigan Court of Appeals, the other acts evidence was relevant and admissible at trial. Under state law, the trial court was not obligated to provide a limiting instruction absent a request. *See* MICH. COMP. LAWS § 768.29; *People v. Chism*, 390 Mich. 104, 120-21, 211 N.W.2d 193, 200 (1973). There is also no federal constitutional right to a *sua sponte* instruction on the proper consideration of other acts evidence. *See, e.g., Jordan v. Berghuis*, No. 07-CV-12229, 2009 WL 1798861, *10 (E.D. Mich. June 23, 2009) (citing *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 811 (N.D. Ohio 2001), *rev'd in part on other grounds by Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003)). The trial court was thus not required to *sua sponte* instruct the jury on the use of the other acts evidence. *See, e.g., Williams v. Berghuis*, No. 2:07-CV-15490, 2009 WL 5217841, *19 (E.D. Mich. Dec. 28, 2009) (denying habeas relief on similar claim). The trial court's instructions on the elements of the crime, what constitutes evidence, the burden of proof, and other relevant matters

were sufficient to satisfy due process.  Habeas relief is not warranted on this claim.

### C.   Prosecutorial Misconduct Claims

Petitioner next asserts that he is entitled to habeas relief because the prosecutor engaged in misconduct during closing arguments by vouching for Barbara Boudro's credibility and using the prestige of the prosecutor's office to convict him, by calling him a monster and other derogatory names, and by appealing to the jury's sympathy for the victims.  The state trial court denied relief on these claims finding them to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal.[2]  The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

The United States Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights.  *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases).  First, the court must determine whether the challenged statements were indeed improper.  *Id*. at 452.  Upon a finding of impropriety, the court must decide whether the statements were flagrant.  *Id.*  Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury

---

[2]The Court notes that the Michigan Court of Appeals ruled that similar prosecutorial misconduct claims raised by Petitioner's co-defendant on direct appeal lacked merit and denied relief on those claims.  *See Duvall*, 2005 WL 1249238 at *4.

or prejudice the accused; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.  *Id.*; *see also Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006); *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000) (citing *United States v. Francis*, 170 F.3d 546, 549-50 (6th Cir. 1999)).  "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations omitted).

Petitioner first asserts that the prosecutor improperly vouched for witness Barbara Boudro. It is well-settled that it is improper for a prosecutor to express his or her own personal beliefs and opinions concerning the credibility of a witness.  *See United States v. Young*, 470 U.S. 1, 9-10 (1985); *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002).  Such statements are improper because they can convey the impression that the prosecutor has evidence not presented to the jury which supports the charge against the defendant thereby infringing upon the defendant's right to be judged solely based upon the evidence presented and because the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own.  *See United States v. White*, 58 F. App'x 610, 617-18 (6th Cir. 2003) (citing cases).

The prosecutor in this case did not improperly vouch for Boudro's credibility.  Rather, the prosecutor argued that Boudro should be believed based upon the substance of her testimony, her demeanor, and the other evidence presented at trial.  It is well-established that a  prosecutor may argue reasonable inferences from the evidence, *see Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir.

21

2000), and may argue from the facts that a witness is or is not worthy of belief.  *See Portuondo v. Agard*, 529 U.S. 61, 69 (2000).  Petitioner has not shown that the prosecutor's comments on Boudro's testimony were improper or that they deprived him of a fundamentally fair trial.

Petitioner also asserts that the prosecutor improperly called him a monster and other derogatory names.  It is inappropriate for a prosecutor to make personal attacks on a defendant or defense counsel.  *See, e.g., United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996).  The prosecutor's brief and isolated remark that the defendants' human faces were "nothing more than masks for monsters" and "masks for an evil so dark that your worst nightmare pales in comparison," while not to be condoned, arose from references to the trial testimony and do not rise to the level of a constitutional violation.  *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) ("Calling [defendant] a 'demon' comes closer to the line—it was unnecessary and unprofessional—but it goes no further than similar comments that have not required setting aside a state conviction."); *Hutchison v. Bell*, 303 F.3d 720, 750-51 (6th Cir. 2002) (denying habeas relief on prosecutorial misconduct claim where prosecutor described the defendant as having "evil ways" and being "an evil force"); *accord United States v. Fields*, 483 F.3d 313, 360-61 (5th Cir. 2007) (use of "colorful pejoratives" is not improper as long as the pejorative is supported by the evidence); *Gonzalez v. Carey*, 58 F. App'x 269, 270 (9th Cir. 2003) (prosecutor's reference to petitioner as a "thug" was a reasonable inference based on evidence that petitioner abducted, beat, and stabbed the victim).  Petitioner has not shown that the prosecutor's remarks denied him a fundamentally fair trial.

Lastly, Petitioner asserts that the prosecutor improperly appealed to the jury's sympathy for the victims.  It is well-settled that a prosecutor may not make remarks "calculated to incite the

passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). A prosecutor improperly invokes the passions and prejudices of the jury when he or she "calls on the jury's emotions and fears – rather than the evidence – to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). The prosecutor did not do so in this case. Rather, the prosecutor focused on the evidence and circumstances of the crime and urged the jury to convict Petitioner based upon the evidence. Petitioner has not shown that he was denied a fair trial.

To the extent that any of the prosecutor's comments were improper, they were not so flagrant as to render the trial fundamentally unfair. Additionally, any potential prejudice to Petitioner was mitigated by the fact that the trial court properly instructed the jurors on the law, explained that the attorneys' comments were not evidence, and directed them not to let sympathy or prejudice influence their decision. *See Knapp v. White*, 296 F. Supp. 2d 766, 776 (E.D. Mich. 2003). Jurors are presumed to follow the court's instructions. *See United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors...take an oath to follow the law as charged, and they are expected to follow it."). Petitioner has failed to establish that the prosecutor engaged in misconduct which rendered his trial fundamentally unfair. Habeas relief is not warranted on such a basis.

### D.   Non-Disclosure of Evidence Claim

Petitioner also asserts that he is entitled to habeas relief because the prosecution failed to disclose that a prosecution witness was a paid informant. Petitioner does not identify the "paid informant" in his petition, but argued in his motion for relief from judgment that Lloyd Harmon and Connie Sundberg were paid witnesses. The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal. The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable

application of federal law or the facts.

Petitioner has failed to establish a violation of his federal constitutional rights.  It is well-settled that there is no general constitutional right to discovery in a criminal case.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988).  The United States Supreme Court has held that the prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In other words, to find a *Brady* violation, not only must the evidence be suppressed, but the suppressed evidence must be material and favorable to the accused.  *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985).

Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432-36 (1995).  Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce."  *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993).  The duty to disclose favorable evidence includes the duty to disclose impeachment evidence.  *Bagley, supra; Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The *Brady* rule only applies to "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."  *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Mullins v. United States*, 22 F.3d 1365, 1370-71 (6th Cir. 1994).  A *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure.  *See United States v. Word*, 806 F.2d 658, 665 (6th Cir.

24

1986).  In order to establish a *Brady* violation, a petitioner must show that:  (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt.  *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The petitioner bears the burden of establishing a *Brady* violation.  *Carter*, 218 F.3d at 601.

Petitioner has not met his burden.  First, the expenses paid to Harmon and Sundberg to appear as witnesses were disclosed by Detective Lesneski when he testified at trial and Petitioner has not shown that any delay in that disclosure prejudiced his defense.  Second, to the extent that Petitioner believes that there was another undisclosed paid informant, he has failed to identify that person and detail his claim.  Conclusory allegations, without evidentiary support, do not provide a basis for habeas relief.  *See Cross v. Stovall*, 238 F. App'x 32, 39-40 (6th Cir. 2007); *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003); *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify federal habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis for an evidentiary hearing in habeas proceedings).  Third, Petitioner has not shown that there is a reasonable probability that, had any such impeachment evidence been previously disclosed to the defense, the result of the proceeding would have been different.  Defense counsel had sufficient opportunity to cross-examine the prosecution witnesses and attack their credibility.  Lastly, there is no indication in the record that the prosecution intentionally withheld information.  Given such circumstances, the Court cannot conclude that the prosecutor violated Petitioner's constitutional rights or otherwise deprived him of a fair trial.

Habeas relief is not warranted.

### E.    Due Diligence Claim

Petitioner next asserts that he is entitled to habeas relies because the prosecution failed to exercise due diligence to produce witnesses Dick Smith and Richard Baker at trial.  The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal.  The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to confront the witnesses against him.  "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315 (1973).  For this reason, the prosecution in a criminal trial must make a good faith effort to produce relevant witnesses at trial.  *See Barber v. Page*, 390 U.S. 719, 724-25 (1968).  The standard for evaluating whether the prosecution has made a good faith effort to produce a witness is one of reasonableness.  *Ohio v. Roberts*, 448 U.S. 56, 74 (1990), *overruled on other grounds, Crawford v. Washington*, 541 U.S. 36 (2004).  The failure to produce a relevant witness only serves as a basis for habeas corpus relief if, under federal constitutional law, the petitioner is denied a fundamentally fair trial.  *See Moreno v. Withrow*, 61 F.3d 904, 1995 WL 428407, *1-2 (6th Cir. 1995) (failure to call *res gestae* witness did not render trial fundamentally unfair and did not constitute prosecutorial misconduct).

Petitioner has not shown that the prosecution failed to exercise due diligence to produce the witnesses and/or that he was denied a fair trial by their non-appearance at trial.  As an initial matter, Petitioner has offered no evidence regarding the prosecution's efforts to locate and produce the

26

witnesses. The record indicates that a reasonable effort was made with respect to Richard Baker given that Detective Lesneski testified that Baker had a stroke and could not appear at trial. Second, even if the state erred in failing to produce the witnesses, Petitioner has not shown that his trial was fundamentally unfair. He has not offered affidavits or other statements from the missing witnesses to show that their testimony would have benefitted his defense or that he was otherwise prejudiced by the failure to produce them. As noted, conclusory allegations, without evidentiary support, do not provide a basis for habeas relief. *See Cross*, 238 F. App'x at 39-40; *Prince*, 78 F. App'x at 442; *Workman*, 160 F.3d at 287. Petitioner has failed to establish a violation of his constitutional rights. Habeas relief is not warranted on this claim.

### F.     Amendment of Information Claim

Petitioner also asserts that he is entitled to habeas relief because the trial court allowed the prosecution to amend the information concerning the date of the crime from on or about November 23 or 24, 1985 to include November 25, 1985. The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal. The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof.

While prosecutors must "refrain from improper methods calculated to produce a wrongful conviction," *Berger*, 295 U.S. at 88, they have significant discretion in determining what charges to file against an accused provided that probable cause exists to believe that an offense was committed by the accused under the charging statute. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *United States v. Davis*, 15 F.3d 526, 529 (6th Cir. 1994). Amendments to a state criminal information are permissible so long as the amendment does not alter the degree of the

27

crime charged or unfairly surprise the defendant. *See, e.g., Wright v. Lockhart*, 854 F.2d 309, 312 (8th Cir. 1988); *Sharrar v. Foltz,* 658 F. Supp. 862, 866-67 (E.D. Mich. 1987) (changing date of alleged sexual assault just before trial did not prejudice petitioner where he failed to identify additional witnesses or show that he would have conducted defense differently).

In this case, the amendment to the information did not alter the degree of the charged crimes nor unfairly surprise Petitioner. The record indicates that pre-trial statements by witnesses indicated that the crime may have occurred after midnight on the evening of November 24, 1985. Additionally, Petitioner did not assert an alibi defense for that day and he has not otherwise shown that his defense was prejudiced by the amendment to the information. Petitioner had ample opportunity to defend against the charges. He has failed to establish a due process violation. Habeas relief is not warranted on this claim.

### G.   Witness Coercion Claim

Petitioner next asserts that he is entitled to habeas relief because the prosecution coerced witnesses to testify at trial. The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal. The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

Under federal and Michigan law, a criminal defendant does not have standing to challenge the voluntariness of a statement made by a witness to the police because the privilege against self-incrimination of the Fifth and Fourteenth Amendments is personal in nature and does not extend to third parties called as witnesses at trial. *See United States v. Nobles*, 422 U.S. 225, 234 (1975); *Berry v. Mintzes*, 529 F. Supp. 1067, 1075 (E.D. Mich. 1981); *People v. Jones*, 115 Mich.

App. 543, 548, 321 N.W.2d 723 (1982), *aff'd* 419 Mich. 577 (1984). While the United States Court of Appeals for the Sixth Circuit has indicated that the use of a witness's coerced testimony may violate a defendant's rights under the Due Process Clause of the Fourteenth Amendment, *see Bradford v. Johnson*, 476 F.2d 66 (6th Cir. 1973), the United States Supreme Court has not so ruled. *See, e.g., Samuel v. Frank*, 526 F.3d 566, 569 (7th Cir. 2008); *see also Johnson v. Bell*, 525 F.3d 466, 479-81(6th Cir. 2008) (distinguishing *Webb v. Texas*, 409 U.S. 95 (1972), and *Washington v. Texas*, 388 U.S. 14 (1967), and denying relief on claim that authorities coerced witness into providing favorable prosecution testimony). Federal habeas review is limited to a determination of whether the state court decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412; *see also Knowles*, 129 S. Ct. 1411 at 1419; *Mitzel v. Tate*, 267 F. 3d 524, 530-531 (6th Cir. 2001). Petitioner has failed to state a claim upon which habeas relief may be granted as to this issue.

Even assuming that Petitioner states a valid due process claim, he has not shown that he is entitled to relief on such a basis. Petitioner makes generalized and unsupported allegations of improper conduct in his pleadings, but fails to present any evidence to support his claim that witnesses were coerced, threatened, or promised leniency in exchange for testifying at trial. As noted, conclusory allegations do not provide a basis for habeas relief, *see Cross*, 238 F. App'x at 39-40; *Prince*, 78 F. App'x at 442; *Workman*, 160 F.3d at 287, or provide grounds for an evidentiary hearing on habeas review. *See Washington*, 455 F.3d at 733. Petitioner has failed to establish a violation of his constitutional rights.

Petitioner is also not entitled to habeas relief any claim that the prosecution presented false

29

testimony from Boudro and/or other prosecution witness.  The United States Supreme Court has made clear that the "deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972).  It is well-settled that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted); *see also Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).  A habeas petitioner bears the burden of proving that the disputed testimony constituted perjury.  *Napue*, 360 U.S. at 270.  To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew that the statements were false.  *Coe*, 161 F.3d at 343.

Petitioner makes no such showing.  Although the disputed testimony was certainly material, the record does not demonstrate that the prosecution witnesses provided false testimony or that the prosecutor purposefully elicited false testimony.  Petitioner essentially challenges the credibility of the prosecution witnesses' testimony, but has not shown it to be false.  There is no evidence that the prosecution had reason to doubt the testimony of those witnesses or otherwise knowingly presented false testimony.  As noted, conclusory allegations of improper conduct are insufficient to justify habeas relief.  Petitioner has not established a violation of his constitutional rights.

Lastly, Petitioner appears to challenge the sufficiency of the evidence presented at trial by claiming that the witnesses were coerced and/or testified falsely.  Due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to

30

constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "The *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16).

Under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *See Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. den.* _ U.S. _, 130 S. Ct. 1081 (2010). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Matthews*, 319 F.3d at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *See People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); MICH. COMP. LAWS § 750.316. Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App.

31

158, 170, 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999). Additionally, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense. *See People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216, 218 (1967). In other words, "proof of [the] defendant's connection with the alleged offense is an indispensable element of [the prosecutor's] duty." *Id.* Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *see People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the identity of the perpetrator, *see Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002); *Kern*, 6 Mich. App. at 409; *see also People v. Johnson*, 146 Mich. App. 429, 434, 381 N.W.2d 740, 742 (1985), and the defendant's intent or state of mind. *See People v. Dumas*, 454 Mich. 390, 398, 563 N.W.2d 31 (1997); *see also People v. Nowack*, 462 Mich. 392, 402-403, 614 N.W.2d 78 (2000).

In this case, the prosecution presented sufficient evidence to establish that Petitioner (and his co-defendant) killed the victims. In particular, the testimony from Barbara Boudro describing the killings and the testimony from several witness relating the defendants' admissions to the killings, if believed, proved beyond a reasonable doubt that Petitioner and his co-defendant committed the charged offenses. Petitioner's insufficient evidence claim challenges credibility of the prosecution witnesses and the inferences the jury drew from the evidence presented at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. *See Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the

prosecution, and must defer to that resolution."). Petitioner has failed to establish a violation his constitutional rights. Habeas relief is not warranted.

**H.     Ineffective Assistance of Trial Counsel Claims**

Petitioner also asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to request a jury instruction on the proper consideration of the other acts evidence and for failing to properly investigate his case. As to the first issue, the Michigan Court of Appeals denied relief on direct appeal, finding that Petitioner had failed to properly preserve the issue for appeal and that he had failed to overcome the presumption that trial counsel's conduct was sound trial strategy. *Duvall*, 2005 WL 1249238 at *4-5. As to the second issue, the state trial court denied relief on collateral review, finding the claim to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal. The state courts' denial of relief as to both issues is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690.

33

The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id*. at 788.

Petitioner first asserts that trial counsel was ineffective for not requesting a jury instruction on the proper consideration of the other acts evidence. Petitioner has failed to establish that counsel was deficient for not requesting such an instruction. Counsel may have reasonably determined that

34

such a limiting instruction would only draw further, unnecessary attention to the other acts evidence at the end of trial.  Furthermore, it was reasonable for counsel, as a matter of trial strategy, to instead contest the credibility of the witnesses and argue that their claims were outlandish and exaggerated.  Such conduct was strategic and a legitimate avenue to challenge the other acts evidence.  The fact that counsel's strategy was ultimately unsuccessful does not mean that counsel was ineffective.  *See, e.g., Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").  Petitioner has failed to establish that counsel erred in this regard.

Petitioner also asserts that trial counsel was ineffective for failing to investigate an alibi defense that he was with family for Thanksgiving at the time of the incident, for failing to investigate Barbara Boudro's mental health history, for failing to investigate witness coercion, and for failing to investigate Boudro's pre-trial identification of the defendants in police photographs. It is well-established that defense counsel has a duty to conduct a reasonable investigation into the facts of a defendant's case, or to make a reasonable determination that such investigation is unnecessary.  *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003); *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007) ; *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns*, 395 F.3d at 258. Decisions as to what evidence to present and whether to call certain witnesses, however, are presumed to be matters of trial strategy.  When making strategic decisions, counsel's conduct must be reasonable.  *See Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S.

35

at 522-23.  The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense.  *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

As to each of trial counsel's claimed investigative failures, however, Petitioner has failed to present any witness affidavits or other documentation to substantiate his claims.  His speculative and conclusory allegations regarding the content of such testimony do not establish that trial counsel was ineffective, that he was deprived of a substantial defense, or that he is entitled to federal habeas relief.  *See Cross*, 238 F. App'x at 39-40; *Prince*, 78 F. App'x at 442; *Workman*, 178 F.3d at 771; *see also Washington*, 455 F.3d at 733.

Additionally, as to the potential alibi defense, the Court notes that the incident was alleged to have occurred during the weekend of November 23-25, 1985 and Thanksgiving was on Thursday, November 28, 1985. Counsel may have reasonably determined that Petitioner's whereabouts on Thanksgiving Day were not particularly relevant to the case at hand.  The trial record  indicates that counsel extensively cross-examined prosecution witnesses, challenged the prosecution's evidence, and presented defense witnesses and Petitioner's own testimony in support of his defense and claim of innocence.  Such a strategy was reasonable under the circumstances. As the Supreme Court has recently stated, "[t]here comes a point where a defense attorney will reasonably decide that a [certain] strategy is in order, thus making particular investigations unnecessary. . . .Those decisions are due a heavy measure of deference." *Cullen*, 131 S. Ct. at 1407 (reversing grant of habeas relief on ineffective assistance of counsel claim) (citations omitted).  As noted, the fact that trial counsel's strategy was ultimately unsuccessful does not mean that counsel was constitutionally ineffective. *Moss*, 286 F.3d at 859.  Petitioner has failed to establish that trial

36

counsel was ineffective in this regard.

Petitioner has not shown that further investigation into Boudro would have uncovered a history of severe mental illness and/or that such information would have benefitted the defense. Boudro admitted at trial that she had a substance abuse problem at the time of the incident and that she had been suicidal and taken prescription medication at a later point in time. Counsel and the jury were well aware of Boudro's mental health issues. Petitioner has not offered medical records or other evidence in support of this claim nor demonstrated that any such additional information would have affected the outcome at trial. He has failed to establish that counsel was ineffective for failing to further investigate this issue.

Similarly, Petitioner has failed to substantiate his claims that trial counsel erred by failing to uncover evidence of witness coercion or promises of leniency or by failing to properly challenge Boudro's pre-trial identification of the defendants. The record reveals that trial counsel cross-examined the witnesses about their versions of events, their motivations for testifying, and their identifications of the defendants as the perpetrators of the crime. Petitioner's conclusory allegations are insufficient to establish that counsel erred and/or that he was prejudiced by counsel's conduct as required under the *Strickland* standard. Petitioner has not shown that he was deprived of a substantial defense. Habeas relief is not warranted.

## I.     Ineffective Assistance of Appellate Counsel Claim

Petitioner relatedly asserts that he is entitled to habeas relief because appellate counsel was ineffective for failing to raise several of the foregoing issues on direct appeal and for failing to pursue exculpatory information such as recanted testimony. The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied

37

leave to appeal.  The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof.

In order to establish ineffective assistance of appellate counsel, Petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  Judicial scrutiny of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689.  The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).  The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy .... Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.  Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52).  "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).  Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have

38

resulted in reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner has failed to show that by omitting the claims presented in his motion for relief from judgment appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel presented legitimate issues, including challenges to the evidence, the jury instructions, and the effectiveness of trial counsel. Petitioner has not shown that appellate counsel's strategy in presenting those claims and not raising the claims contained in the motion for relief from judgment was deficient or unreasonable. Given the state court decisions and this Court's determination that the foregoing claims lack merit, Petitioner cannot establish that he was prejudiced by appellate counsel's conduct.

Petitioner has also failed to substantiate his claim that appellate counsel ignored or failed to investigate exculpatory information. He has not offered any newly-discovered exculpatory information or presented affidavits or other testimony from any recanting witnesses. As noted, conclusory allegations, without evidentiary support, do not provide a basis for habeas relief, *see Cross*, 238 F. App'x at 39-40; *Prince*, 78 F. App'x at 442; *Workman*, 160 F.3d at 287, or an evidentiary hearing on habeas review. *See Washington*, 455 F.3d at 733. Petitioner has failed to establish that appellate counsel was ineffective. Habeas relief is not warranted on this claim.

### J.     Cumulative Error Claim

Petitioner asserts that he is entitled to habeas relief based upon the cumulative effect of the alleged errors at trial. The state trial court denied relief on this claim finding it to be "without any arguable merit" and the Michigan appellate courts denied leave to appeal. The state courts' denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Petitioner cannot establish that he is entitled to habeas relief based upon cumulative error because

39

he has failed to demonstrate an underlying constitutional violation. *See Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006). The United States Court of Appeals for the Sixth Circuit has noted that the Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Habeas relief is not warranted on the basis of cumulative error.

**V.   Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained his habeas petition and the petition must be denied.[3]

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits. *Id*. at 336-37.

Having conducted the requisite review, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims. A

---

[3]Given this merits determination, the Court need not address Respondent's statute of limitations or procedural default arguments. The Court notes, however, that it would find those arguments unavailing under current law.

certificate of appealability is not warranted.  The Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal as any appeal cannot be taken in good faith.  *See* Fed. R. App. P. 24(a).

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability and leave to proceed *in forma pauperis* on appeal are **DENIED**.


s/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  January 31, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 31, 2012, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager